[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Jose P. was born in Caguas, Puerto Rico on November 11, 1983; Juan P. was born in Hartford on November 10, 1987; and Jonathan P. was born in Hartford on April 12, 1985. The mother of the children is Maria H., date of birth July 1, 1966; the father is Jose P., Sr., date of birth September 23, 1962. The matters are before the court on termination of parental rights petitions filed with respect to Jose and Juan, and on a neglect/uncared for petition as to Jonathan.
Jose P. was committed to the Department of Children and Youth Services (DCYS), now the Department of Children and Families (DCF), as a neglected child (permitted to live under conditions or circumstances injurious to his well-being) on May 1, 1990.[2] Juan P. was committed to the Department as a neglected child (denied proper care and attention physically, emotionally, and morally; and, permitted to live under conditions, circumstances, or associations injurious to his well-being) on January 28, 1991.[3] The pending neglect/uncared for petition on Jonathan P. was filed May 1, 1992.[4]
The statutory grounds alleged in the termination petitions filed with respect to Jose P. and Juan P. are identical; as to both parents, each petition alleges grounds to terminate under General Statutes Section 17a-112(b) (1)(Abandonment), (2) (Failure To Rehabilitate), and (4) (No Ongoing Parent-Child Relationship).[5] The neglect/uncared for petition on Jonathan P. alleges that the child is neglected in that he was abandoned (by father); was permitted to live under conditions injurious to his well-being; and, has been denied proper care and attention physically and educationally; the petition further alleges that the child was uncared for in that he was homeless.[6]
Notice and Jurisdiction
The termination petitions on Jose and Juan, filed March 20, 1992, set forth a specific Hartford address as the residence of the respondent/parents. The affidavit of the process server, dated April 3, 1992, states that following a CT Page 8158 "diligent search," he was unable to effect in-hand service on the parents and found that the parents did not reside at their last known address.[7] Accordingly, petitioner, filed motions for orders of notice by publication which were granted on April 7, 1992, legal publication to run in the Hartford Courant. The affidavit(s) filed by the newspaper, with attached legal advertisements; confirmed that publication was effectuated in conformity with the court's order(s).
The neglect/uncared for petition filed with regard to Jonathan P. also set forth a specific Hartford address as the residence of both parents. The return of service, dated May 2, 1992, filed by the process server, attests to abode service respecting both respondents. Prior to the plea dates, the court directed that summonses (with attached petitions) be served informing the parents of the established date and time each petition would be heard; the return(s) of service annexed to each of the said summonses attested to abode service at the parents' residence as set forth on the petitions. On May 21, 1992, the court confirmed service, on the record, as follows: (1) Continued TPR Plea, In Re Jose P. and Juan P., "Service Confirmed: both parents by publication and summons by abode;" and, (2) Neglect and Uncared For Plea, In Re Jonathan P., "Service Confirmed: both parents by abode."
The court finds that service has been effected in accordance with the requirements of law, and, that the court has jurisdiction.
Standard of Proof
(Termination Petitions)
With regard to "termination of parental rights," the term is statutorily defined as "the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent or parents so that, the child is free for adoption . . ." General Statutes45a-707(g). It is a judicial matter of exceptional gravity and sensitivity. Anonymous v. Norton, 166 Conn. 421, 430
(1975). Termination of parental rights is the ultimate interference by the state in the parent-child relationship and, although such judicial action may be required under certain circumstances, the natural rights of the parents in their children "undeniably warrants deference and, absent a CT Page 8159 powerful countervailing interest, protection." Stanley v. Illinois, 405 U.S. 645, 651 (1972).
The constitutional guarantee of due process of law requires that the statutory ground(s) for termination of parental rights be established by "clear and convincing" evidence; not merely a fair preponderance. Santosky v. Kramer, supra. Thus, the standard of proof as mandated by Conn. General Statutes Section 17a-112(b) and Practice Book Section 1049 is "clear and convincing" evidence.
Termination of parental rights is in two states: the adjudication and the disposition. The adjudicatory stage involves the issue of whether the evidence presented established the existence of one or more of the statutory grounds as of the date the petition was filed or last amended (substantively). In Re Juvenile Appeal (84-AB), infra at p. 262; In Re Nicolina T., 9 Conn. App. 598, 602 (1987); In Re Luke G., 40 Conn. Sup. 316, 324 (1985). Only upon establishment of one or more of the statutory grounds, may inquiry be made regarding the ultimate best interests of the child.
FACTUAL FINDINGS
The credible evidence presented during the orderly course of the trial established the following facts.
A. Factual Findings As To Events Antedating The Filing of the Termination Petitions
Respondent/mother, twenty-seven years of age, was born in Caguas, Puerto Rico; she has a sixth grade education, has not been employed, and receives state assistance. Respondent/father, thirty-one years of age, dropped out of high school, has held a number of jobs as an unskilled worker, and, at time of trial, was incarcerated. The parents have four children; Yvonne P., d/o/b 7/29/82; Jose P., d/o/b 11/11/83; Jonathan P., d/o/b 4/12/85; and, Juan P., d/o/b 11/10/87.
Some years back, in early 1987, the Department received a referral on Jonathan P. from emergency room staff at Saint Francis Hospital; the child was reported to have been burned, had a high fever, swelling on his right leg, and possible CT Page 8160 infection; the mother had not sought medical attention until approximately one week after the injury. The child was voluntarily placed, through DCF, with the maternal grandmother; he was thereafter adjudicated a neglected child (denied proper care and attention physically and medically) and, on or about May 25, 1988, the court, ordered the Department to provide PS for a period of six months (until 11/25/88), with established expectations.[8] At an in-court review conducted on October 25, 1988, it was reported that all of the expectations had been compiled with, and that the PS would end on November 25, 1988. In 1988, it was reported that Jonathan P. was hyperactive, that he had resided for a lengthy period with his maternal grandmother, and that the grandmother had brought the child for all of his medical appointments. It was also reported that the oldest child, Yvonne, and the second born, Jose, attended school regularly, were both very hyperactive, and that the mother had a difficult time controlling the children. However, as of 1988, no referrals respecting either of the other two children had been received by the agency.[9]
On or about May 30, 1989, DCF filed a neglect petition on Jose P., alleging that the child had been denied proper care and attention, was permitted to live under conditions and circumstances injurious to his well-being, and that Jose had suffered infliction of physical injuries upon him other than by accidental means; the filing of the petition was precipitated by referrals from the child's school after a teacher had observed a burn-mark on the child's shoulder, scratches"across his left cheek, and a bruise on the child's back.[10] Jose P. was subsequently adjudicated a neglected child and, on October 30, 1989, was committed to the Department, effective upon placement with the paternal aunt, JP. At the dispositional hearing, the following expectations were established by the court and were set forth on a CIP agreement form which was signed by respondent/mother: (1) maintain contact and cooperate with DCYS; (2) visit the child as much as possible; (3) participate in counseling (DCYS to make initial appointment); (4) secure adequate income and housing; and, (5) cooperate with VNA or parent aide as recommended by DCYS.
Jose remained in his aunt's home until June 1990, at which point that foster placement ended as the aunt relocated in Puerto Rico due to domestic problems. From June 20, 1990 CT Page 8161 July 26, 1990, Jose P. was placed, briefly, in two foster homes, the R. home and the M. home; both foster parents requested his removal due to behavioral problems. In late July 1990, Jose was admitted to the ABC Unit at Mr. Sinai Hospital; the child remained at Mr. Sinai for approximately six days and, upon discharge, entered the SRH at East Windsor.
On July 30, 1990, DCF filed a neglect petition on Juan P. alleging that that child was being denied proper care and attention, and, was being permitted to live under conditions, circumstances, or associations injurious to his well-being. The petition specified that in March 1990, Juan P. had been observed to have burns over approximately sixty percent of his stomach area, regarding which the mother's explanation was considered by the Department to be unsatisfactory; the child had not received medical care for these burns.[11] Further, it was also alleged that ER staff at Saint Francis Hospital contacted DCF stating that Juan had been brought in by the mother after the tip of the fifth finger on his right hand had been severed causing permanent disfigurement; the mother's explanation was that the wind had slammed the bathroom door on the child's finger. At that time, the child was admitted to the hospital for observation and discovered to have numerous old scars and burn marks on his body.[12] Respondent/mother admitted being overwhelmed, stated she was encountering difficult marital problems, and requested the assistance of DCF with the child. On or about May 7, 1990, Juan P. was placed in the R. Foster home in Hartford, where he remained for approximately five months to October 16, 1990, when the foster parent(s) requested removal of the child because of behavioral problems. In October 1990, Juan P. was placed in the M. Foster home in Hartford where he has remained to date.
On November 19, 1990, Juan P. was adjudicated a neglected child as originally pleaded, the abuse allegations having been dismissed (without finding and prejudice). Disposition was deferred pending consideration of the maternal grandmother as a possible foster placement.[13] On January 28, 1991, the mother requested a transfer of the guardianship of said child to the MGM; the court, however, consistent with the recommendation of the agency, and the report of the attorney for the children, committed Juan P. to DCF for a period not to exceed eighteen months.[14] Expectations were established as set forth on the CIP agreement form, signed by the mother in the presence of her attorney; the expectations included: (1) CT Page 8162 keep all appointments set by or with the agency, and keep whereabouts known to both DCF and the attorney; (2) visit the child (Juan P.) as often as possible — at least once per week; and, (3) participate in counseling, individual/parenting.[15]
As stated, Juan P. has remained in the M. Foster home.[16]
Jose P. was first placed in his aunt's home; the parents maintain that they visited with the child during that placement, which ended around mid-June 1990.[17] During June and July 1990, prior to Jose's placement at the SRH (late July 1990), the Department asserts that the parents had infrequent contact with the child, who was then six years of age; however, the foster parents were not called to testify, and no record of visitations was put in evidence. DCF contends that while Jose was at the SRH, the parents visited him, over a period of several months, approximately ten or twelve times, most of the said visits having been unannounced.
Between the date of Juan P.'s commitment (1/28/91) and June 28, 1991, DCF reports the parents visited, individually or together, a total of five times: 3/8/91, (mother only), 3/25/91 (mother only), 5/31/91 (father only), and 6/7/91 (both parents).[18] During the months of July through September 1991, the parents were permitted to have Juan P. home for visits, which occurred on four or five occasions.
Jose P. remained at the SRH from July 31, 1990 until early November, 1991; in May and June 1991, the child had day visits at home from the SRH and, at all other times, the parents were expected to visit the child at the East Windsor facility. On one of the home visits, Jose P. returned to the SHR with a three pronged puncture wound on his back, believed to have been caused by a metal fork. Upon heaving the SRH, Jose P. went to a CFS specialized foster home, was provided appropriate therapeutic services through the extended day treatment program at the IOL, and, on or about 1/31/92, began counseling at CFS.
In November 1991, at the time Jose was due to leave the SRH, the Department had been quite concerned regarding the irregular and erratic pattern of the parents' visitation with both children, and it was felt that the parents favored visitation with one child over the other. Accordingly, the Department, at that time, prepared a detailed service agreement which, it believed, would serve to define CT Page 8163 specifically for both parents just what was expected of them in terms of visitation, counseling, cooperation with CFS, and with regard to the overall plan devised to effectuate an eventual reunification. Between November 4 and November 5, 1991, arrangements had been made for the mother (and father) to come into the DCF office, review the plan carefully with the worker, and execute the service agreement. Apparently, on the first day, the mother arrived several hours late and the appointment was rescheduled for the next day, when the parent telephoned saying she could not be present. When the parent(s) did not appear to sign the agreement on either of the following two days, the social worker, her supervisor and other staff met and a decision was made to suspend the parents' visitation with both Jose and Juan until the parents agreed, in writing, to a schedule of regular visitation, to attend counselling, to cooperate fully with CFS, and to take all steps necessary for a reasonably prompt reunification. All visitation with both children was suspended on or about November 8, 1991. On the boys' birthday, the parents appeared for visitation and were told that as a result of their not signing the agreement, visitation had been suspended, and that they would not be permitted to see the boys.[19] It does not appear that visitation with Jose and Juan ever resumed; according to the social worker, the decision to suspend visitation was made by DCF after discussions with, and input from, CFS. The worker stated that the purpose of suspending the parents' visitation with their two sons was to "motivate" the parents to sign the service agreement, to visit regularly and evenly with both children in accordance with a specific visitation schedule, to attend the group and individual counseling, and to cooperate fully with CFS in working towards reunification.
At the time of the commitments of both children (Jose and Juan), the established expectations required these parents to participate in group and individual counseling. Following the commitment of Jose (11/1/89), DCF made a referral to the Clark Clinic on Albany Avenue; according to the worker, the therapy "took months to arrange," primarily because the Clinic insisted that the parents come in and request help, which they did not do until July 1990. Between June 19, 1990 and January 23, 1992, group, individual, and couples' counseling and therapy was in place pursuant to the DCF referral; however, during that period, the family participated in less than half of the appointments made for them with Dr. Rojano at the CT Page 8164 Clinic.[20] Around November 1991, Dr. Rojano left Clark Clinic and the parents' file was transferred to Dr. Rivera, who was unsuccessful in his attempts to contact the parents; the case at Clark Clinic on these parents was closed on January 23, 1992. Additionally, although the child Jose has attended counseling sessions at his school since November 1991, and at CFS since January 1992, the parents have not involved themselves in the child's counseling program, and, have not participated in his treatment plan developed by CFS.
The evidence indicated that the parents generally arranged their own transportation respecting visitation and attendance at counseling and therapy. However, DCF did issue some bus passes and reimbursement for March and April 1991, and another voucher in July 1991.[21]
Initially, the parents were given notice of, and attended, certain of the agency's treatment plan reviews. In September and October 1991, DCF held pre-placement meetings on attempts to appropriately place Jose P. from the SRH; both parents attended, and participated in, those meetings. Following the November 1991 suspension of the parents' visitation, contact with the agency, and parental participation in any planning for the children, became minimal; thus, viewed retrospectively, the decision to suspend visitation was ineffective in achieving its intended purpose.
Both the mother and father testified at trial. They denied favoring visitation with one child over the other. The parents insisted they had visited the children regularly, and generally weekly, while the boys remained in foster placement. The father stated that he had been employed by a landscaping firm in Windsor Locks for approximately four years, working steadily. Prior to that employment, he had worked steadily for a three year period at a McDonald's restaurant. According to the father, he and respondent/mother would visit Jose weekly (on a Friday or Saturday) while the child was at the SRH; the parents generally made their own arrangements with regard to transportation, either the father driving, or the father's brother bringing them to visit. The parents testified that they may have missed only four or five of the weekly visits, and on those isolated occasions, the visits were missed due to the car having broken down. The father stated that they usually visited with Jose at the SRH for "one or two hours." They visited the children at the foster CT Page 8165 home(s) until November 1991, when they were told by the foster parent that DCYS would no longer permit visitation. The father stated that when he asked why he could not visit with his children, he was instructed to direct such inquiries to the DCF worker; the parents testified that they undertook to contact the worker, but were unsuccessful in doing so. Both parents stated that in accordance to DCF's instructions, they would visit the two children separately, seeing Jose one day, and visiting with Juan the next. The mother stated that when she was told by the foster mother that visitation with both children had been suspended, she went to the DCF office, but there was "no opportunity" to talk with the worker.[22]
Concerning participation in individual and group counseling, the parents indicated they were referred by DCF to Clark Clinic in June 1990, and that they participated in that counseling for several months, missing only a few weekly appointments due to transportation problems. The parents stated that they stopped going to the sessions when Dr. Rojano informed them that he was "retiring" from the Clinic and would be employed at another facility; the parents testified that they were waiting to hear from either DCF or Clark regarding the scheduling of appointments with a new counselor.[23]
The parents did not participate in further counseling at the Clark Clinic;[24] similarly, they did not engage in family or other counseling through CFS. Between November 1991 and the filing of the petitions, visitation with Jose and Juan was not reinstated; the petitions were filed on March 20, 1991.[25]
B. Facts and Events Subsequent To The Filing of The Termination Petitions
On August 20, 1992 the court ordered an updated psychological examination of parents and children to be performed by Dr. Ramos-Greiner.[26] The updated evaluations were conducted in October/November 1992, and the report was filed on or about December 4, 1992. In conducting the updated evaluations, the psychologist had access to a number of prior evaluations including those conducted by Dr. Saurez. The evaluator found that respondent/mother suffered no "significant psychopathology," although she did display some depressive symptoms; it was the psychologist's assessment that the mother did not have "any intellectual difficulties" which would interfere with her ability to care for the children. CT Page 8166 However, the mother's "personality functioning" was viewed as displaying "dependent and antisocial traits" which could lead to "interpersonal difficulties." The mother's "intellectual ability" was placed in the "average range," and she was seen by the psychologist as "emotionally immature." The mother advised the evaluator that she had used narcotics in the past, had entered a detoxification program, and no longer abused drugs. The evaluator did not feel that detoxification was sufficient treatment for the respondent/mother's substance abuse problems and, therefore, the potential for the future drug abuse was present.[27]
The psychologist placed respondent/father's intellectual ability in the average range, concluding that he possessed no intellectual deficits which would impair his ability to care for the children. However, Dr. Ramos-Greiner stated that father's personality factors included "passive-aggressive and antisocial features" which, together with the father's lack of insight, would substantially interfere with his understanding of what was best for the children, and that he possessed no appreciation of his own behavior (and that of respondent/mother) which led to the placement of the three children. The father was encumbered with a serious substance abuse problems, for which he had only just begun appropriate treatment.
Dr. Ramos-Grenier reported that the child Jose P., then approaching nine years of age, responded "very well" to all questions and cooperated fully with the evaluator. The child indicated that "he liked living with his foster parent, but would like to go back and live with his mother and father." He appeared "happy and well, with none of the problems seen that were evident during prior evaluations." The psychologist reported:
 "The results of the clinical evaluation and projective testing indicate that there is some evidence of optimism concerning the future, which is accompanied by repression of unpleasant past experiences. Maternal dependency is still present since some of his dependency needs have not been fully met. These dependency needs are accompanied by some defensiveness, and he may evidence some faulty comprehension of what transpires within a social framework. This [could] lead to frustration, with aggression used as a way of coping."
CT Page 8167
It was concluded that Jose P. did not display many of the prior significant problems, but "some emotional insecurity was still evident." Further, that Jose P. had an attention deficit disorder (which was successfully treated with medication) and, while not having any substantial intellectual deficits, remains a learning disabled child in continuing need of special educational services. Dr. Ramos-Grenier recommended that if the child were to be returned to his parents, family therapy should be put in place to assure a good transition from foster placement, and to assist the parents in understanding Jose P.'s emotional and educational needs; if, however, parental rights are to be terminated, the child must be provided appropriate therapy since Jose "shows emotional attachment to his parents." The psychologist added that the child should have "regular visitation with his siblings."
With reference to Juan P., age five at the time of the evaluation, it was found that he did not show any significant psychopathology, and his demeanor gave no indication of aggressive or violent behavior. The child informed the psychologist that he wished to live with his parents. As to Juan P., the evaluator stated:
 "The clinical evaluation and projective testing indicate that the child's capacity to seek and gain satisfaction through his own abilities is limited, which reflects an underlying sense of personal impotency and inadequacy. His personal school adjustment . . . is unsatisfactory, which is in part due to an overall difficulty in coping with environmental pressures. The child's tendency to act-out at times is very likely a compensation for his underlying sense of insecurity. This insecurity is based on the uncertainty of his living situation . . .
Dr. Ramos-Grenier concluded that Juan P. did not have any serious, evident emotional problems, but that the child felt insecure due, in part, to his placement status, which insecurity affected the child's general behavior, resulting in some acting-out. Her recommendations were substantially the same as with Jose P.: that if Juan returned to the biological parents, family therapy would be imperative; if, on the other hand, parental rights were terminated, individual psychotherapy should be provided since Juan P. "still had CT Page 8168 strong emotional attachments to his parents." As with Jose P., regular sibling visitation was again strongly recommended.
Jonathan P., age seven at he time of the evaluation, was described as having no serious emotional problems, but having below average intellectual abilities. The child stated, in a "somewhat rote manner," that he wished to live with his mother and father. The psychologist reported that results of the clinical evaluation and projective testing indicated "some regressive tendencies" which could be "a disruptive component to functioning;" it was observed that "[f]eelings of insecurity and inadequacy appear to be leading to "impulsivity and acting-out behavior." Dr. Ramos-Grenier recommended that Jonathan's intellectual and learning deficits be assessed, and that a psycho-educational evaluation be conducted to determine his needs for special education services. Sibling visitation was again strongly recommended.
Following the parent/child observations, Dr. Ramos-Grenier concluded that the biological parents were "clearly the psychological parents of the children;" further, that the relationship between the parents and the children showed "affectionate behavior, and a desire by the children to see, and be with, their parents." In formulating her recommendations, the psychologist noted that although the P/C evaluation disclosed that all the children had "a parent/child bond with [their biological parents], it [was] still . . . clear that both parents did not show an appropriate understanding of the children's needs." According to the evaluator, although the parents' interactions with the children were "positive and loving on the surface," they did not "carry the follow-through" needed to have the children feel secure; furthermore, the parents' continued exposure of the children to repeated disappointments (regarding visitation, etc.) could result in emotional damage to the children which might be difficult to repair in their later lives. The psychologist, therefore, recommended a "time-limited plan," of no more than six months, for a reunification effort; during that period, among the requirements which the psychologist stated should be imposed on the parents were: (1) visit regularly and follow through on any promises made to the children; (2) participate in family therapy sessions with the children, and carry out any recommendations made by the therapist to assist in the children's emotional development; (3) enter a substance abuse program; and, (4) participate in individual psychotherapy, and CT Page 8169 complete child development and parenting classes. Dr. Ramos-Grenier recommended strict adherence to the expectations, with "no deviations allowed," and, if the parents were not willing fulfill all of the requirements, termination of their parental rights should be pursued by DCF. She stated the recommendations were made not to fulfill the parents' needs, but to ensure . . . that the children's best interests were considered since these children . . . had strong emotional ties to each of their parents."
At trial, Dr. Ramos-Grenier repeated that respondents do have the intellectual potential to parent these children, but that the likelihood of success in their doing so is slight because of their extreme immaturity. She testified that both parents are exceedingly immature, very dependent, operate at an almost child-like level, and simply have not faced the reality of having their children permanently taken away. Although both parents have the intellectual ability to parent adequately, (no cognitive problems, and both of average intelligence) each has great difficulty comprehending the consequences of their past behavior respecting these children. According to the evaluator, these parents need "a jolt," and have to be made to understand "this is it"; that is, either they comply and fulfill the expectations, or they will be permanently deprived of rights to the children. Under such circumstances, the parents, according to the psychologist, "might come around," although based on the parents' history, such eventuality is not particularly likely. However, even given the parents' history, the psychologist continued to express the view that the parents should be afforded the additional six month period, with specifically articulated requirements and expectations, and that such additional time would not be harmful to these children. Dr. Ramos-Grenier again emphasized that the parents' expressed desire to parent these children emanated from their own wishes and needs, rather than from any awareness of the interests of the children. She also emphasized, as set forth in her earlier report, that the children are strongly and profoundly attached to the parents, as well as having a strong sibling attachments.
Subsequent to the March 1992 filing of termination petitions on Jose P. and Juan P., DCF obtained an OTC (5/1/92) and filed the neglect/uncared for petition on Jonathan P. When Jonathan was placed, the worker spoke with CT Page 8170 respondent/mother at the Lafayette Street detention facility where she was confined on a Risk of Injury charge. Shortly thereafter (on or about 5/5/92), the worker went to the parents' Hartford apartment, finding it unoccupied and substantially empty of any furnishings.[28] The social worker located the mother and the oldest child, Yvonne, nearby at the MGM's residence and was informed that the apartment had been vacated as the family was moving to Bristol.[29]
At a meeting with the parents in June 1992, conducted at the DCF office, the parents' drug problems were discussed, both parents admitting to using drugs, and both urged to enter substance abuse programs. The father stated that things were not well with regard to the children primarily because DCF would not allow visitation. He indicated he was in a methadone maintenance program and felt that he needed no additional therapy. Respondent/mother acknowledged that she needed help and, on a later date, the worker spoke again with Maria H. in the presence of a drug counselor from the Hispanic Health Council in Hartford. The mother was referred to Crossroads in New Haven; however, she did not wish to enter that inpatient program as it was "too long term" and did not use methadone or other medications.
The case was assigned to a new DCF worker in August, 1992. In September 1992, the pending termination petitions were discussed with respondents, the worker inquiring regarding the executing of voluntary consents; the parents indicated they did not wish to sign consents and wished to visit again with their children. At that time, the parents were still residing in a Bristol shelter and they provided the worker with the maternal aunt's telephone number in Bristol.[30]
Thereafter, neither mother nor father contacted the social worker with their address in Bristol, although they had agreed to do so. The parents did not attend subsequent treatment plan reviews, and, according to the worker, did not contact the Department regarding visitation with the children or any further referral for counseling or drug treatment. Pursuant to court order, a visitation by the parents with Jose P. and Juan p. was scheduled for December 29, 1992; the social worker picked up the boys, but the parents did not appear, call to reschedule, or contact DCF to explain their absence. Both children were extremely disappointed that the parents did CT Page 8171 not visit on the arranged date and, according to the worker, have not subsequently inquired of their parents.[31]
Respondent/father testified that he had participated in a Methadone Maintenance program and in a twenty-one day drug treatment program at the Henderson-Johnson Clinic; he stated he had gone to the Wyllis Street program for almost three weeks, but missed two consecutive sessions and, pursuant to the program's regulations, was discharged prior to completion.[32] Respondent/mother testified she also participated in Methadone Maintenance while in Hartford. Mother stated she attended a program for addicted women for two months, but ceased attending when she moved to Bristol; she went to a Methadone Clinic in Bristol, and also made arrangements for a twenty-one day admission at the UConn Substance Abuse facility in Farmington.
The father testified that he is currently incarcerated awaiting trial on a number of drug related charges, including possession with intent to sell. Both parents stated they wished to enter and complete drug treatment and counseling programs. Both indicated an intention to remain drug free, and take whatever stops were necessary for the return of the children. The parents testified that they always wished to have, and sought, access to their children in placement, and do not want any of the children permanently removed from their care. There have been no referrals on the remaining child, Yvonne.
The three children, Jose P., Juan P., and Jonathan P., remain in foster care. With regard to Jose P. and Juan P., the DCF plan, if the termination petitions are granted, is the provision of permanency through the adoption process; the foster mother is to be considered as a prospective adoptive parent for Juan P., and the child Jose P. would be registered with the Adoption Resource Exchange for the purpose of locating a suitable adoptive family.
C. Additional Factual Findings With Reference To Pending Neglect Petition: Jonathan P.
Information before the court indicated that between 1989 and 1991, the Department had not received referrals with regard to Jonathan P., d/o/b 4/12/85. The child apparently was removed from school by respondent/mother in February 1992, CT Page 8172 the mother advising school administrators that the family was relocating in Waterbury. As of the date of placement (5/1/92), Jonathan P. had been absent from school, overall, approximately thirty days. On April 30, 1992, DCF received a referral from the HPD; an officer, responding to a complaint, went to the family's Hampton Street apartment and found it to be filthy, with no food in the home, and trash strewn everywhere. The mother was arrested for Risk of Injury and held in lieu of posting bond; Jonathan P. was brought by the police to the DCF office where he was observed by the social worker who was aware that this child had a long-standing history of chronic eczema, requiring for years, the administering of medication. The social worker observed that the child was filthy, with a strong odor; he was dressed in clothes that were filthy and too large for him. In changing the child's dirty t-shirt to a clean one, several portions of the child's skin were observed to be "scaly, irritated, and unmedicated;" the child indicated that there was no medication in the apartment. The worker, aware also that this child was visually impaired, observed that he did not have his glasses. The child stated that his eyeglasses had been lost some months before and that his parents had not ordered another pair; further, that he needed eyeglasses for school work, and could not see the blackboard without them. Jonathan told the worker that there was no food in the apartment, and that he had not been to school for several days.
On April 30, 1992, a ninety-six hour hold was invoked and the child was placed; mother was interviewed at Hartford Detention and, on the basis of information furnished by Jonathan, the maternal uncle, who was determined to be caring for Yvonne, was contacted by the worker. The maternal uncle stated that he could care temporarily for just Yvonne, and an OTC was, therefore, obtained for Jonathan P.
Adjudication
A. Neglect Petition: Jonathan P.
The adjudicatory date is the date of the filing of the petition: May 1, 1992. In re Romance M., 30 Conn. App. 339,359 (1993). Unlike petitions to terminate parental rights, a fair preponderance of the evidence is the proper standard of proof in neglect/uncared for proceedings.[33] In re Juvenile Appeal (84-AB), 192 Conn. 254, 264 (1984). CT Page 8173
On the above factual findings relating to the Neglect Petition, the court further finds, applying a fair preponderance standard, the following: (1) Jonathan P. is a neglected child, as alleged, in that: (1) he has been permitted to live under conditions, circumstances, or associations injurious to his well-being; and, (2) he has been denied proper care and attention physically and educationally. Said child is uncared for, as alleged, in that, as of the date of the filing of the petition, he was homeless. With respect to the remaining neglect allegation, abandonment, the court, applying a fair preponderance standard, is unable to conclude that these parents have abandoned Jonathan P. in the "common-law sense;" that is, that as of May 1, 1992, Maria H. and Jose P., Sr. intended to relinquish all control and responsibility with respect to Jonathan P.
Jonathan P. is hereby adjudicated a neglected child (permitted to live under conditions injurious to well-being, denied proper care and attention) within the intent and meaning of the laws of this State.
Jonathan P. is adjudicated an uncared for child (homeless) within the intent and meaning of the laws of the State of Connecticut.
For the reason stated, the neglect ground of abandonment may be, and hereby is, Dismissed.
B. Termination Petitions: Jose P. and p.
General Statutes Section 17a-112(b) sets forth the alternative grounds for termination of parental rights. In order to grant a petition to terminate, the court must conclude that an alleged statutory ground has been established by clear and convincing evidence. These termination petitions were filed March 20, 1992; the court's adjudicatory consideration is limited to those events preceding the filing date. In re Romance M., supra at p. 359. Circumstances subsequent to the filing date may be considered only with reference to an appropriate disposition, consistent with the best interests of the child, following an adjudication. Id. It has been observed that under existing Connecticut law, "the determination of the child's best interests comes into play only after [a] statutory [ground] for termination of parental CT Page 8174 rights [has] been established by clear and convincing evidence." (Emphasis in original). In re Valerie D.,223 Conn. 492, 511 (1992); In re Kelly S., 29 Conn. App. 600, 617-18
(1992).
(1) Abandonment
General Statutes Section 17-112(b)(1) provides: "The superior court . . . may grant . . . [a termination] petition if it finds, upon clear and convincing evidence, that termination is in the best interests of the child and that . . . over an extended period of time, which . . . shall not be less than one year . . . [t]he child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child . . . ."
Statutory abandonment focuses on the parent's conduct; it is a question of fact to be resolved by the trial court, in the light of the relevant circumstances. The test for factually determining statutory abandonment is not limited to simply whether the parent has shown some minimal interest in the child. In re Juvenile Appeal (Docket No. 9489), 183 Conn. 11,14-15 (1981); In re Rayna M., 13 Conn. App. 23, 36 (1987); In re Adoption of Webb, 14 Wash. 651, 657 (1975). Statutory abandonment differs from the concept of abandonment in the common-law sense in that it does not require proof of an intention to abandon totally or permanently. In re Shannon S., 41 Conn. Sup. 145, 151 (1989). "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of `interest, concern or responsibility' for the welfare of a child." In re Migdalia M., 6 Conn. App. 194, 208-09 (1986). In the In re Migdalia M. decision, the Appellate Court stated that statutory abandonment occurs where "a parent fails to visit a child, fails to display love and affection for the child, has no personal interaction with the child, and no concern for the child's welfare." Id. at p. 209.
Section 17-112(b)(1) refers to a parent's failure "to maintain" a reasonable degree of interest, concern or responsibility regarding the child's welfare. Thus, that statute does not contemplate a sporadic showing of the indicia of "interest, concern or responsibility for the welfare of the child," but rather, the term "maintain implies a continuing CT Page 8175 reasonable degree of concern." In re Rayna M., supra; In re Migdalia M., supra. It is noted that "interest" alone is not the criterion for the determination of statutory abandonment; the statute refers to interest, concern or responsibility regarding the child's welfare.
Petitioner contends that the evidence presented established, clearly and convincingly, statutory abandonment on the part of these parents on or before March 20, 1992. The court disagrees. Prior to November 1991, the parents visited with Jose P. and Juan P., both in the foster homes and (with Jose) at the SRH; although the regularity and consistency of the visitation is disputed, petitioner did not present the testimony of any (pre-3/20/92) caretaker (or SRH administrator) to controvert the direct testimony of the parents. Significantly, for the four month period immediately preceding March 20, 1992, the parents wanted to visit the two boys, and undertook to do so, but were expressly enjoined from visiting by the official action of DCF. That the State would act to deprive the parents of visitation for a four month duration, and then, at the end of that period, allege abandonment as a statutory basis for termination of the parents' rights, appears to the court somewhat inconsistent.
The Department's objective in suspending visitation was to have a schedule of visitation and other reunification conditions explicitly reduced to writing; however, in retrospect, the action proved counter-productive, the parents not having had any contact with the boys between early November 1991 and the filing of these petitions (3/20/92), and their overall reunification efforts abating dreadfully (perhaps, in part, as a result of the suspension of visitation) from late 1991 on. It is suggested that the failure to visit post-November 1991 (to date of filing) was the parents' own voluntary action, and not a necessary consequence of DCF's action, since visitation would have been reinstated had the parents appeared and signed the service agreement. It appears to the court, however, that the parents could have been requested to execute a service agreement absent resort to the rather coercive strategy of suspending visitation, particularly when the children wished to see their parents, and when there was a clear, existing relationship between parents and children. In any event, the termination ground which must be established, by clear and convincing evidence, is abandonment, not a reluctance or refusal to sign CT Page 8176 an agreement regarding terms of visitation and other appropriate reunification procedures; on the status of evidence, these parents wished to visit with the children, and undertook to do so.
Unquestionably, the parents have been exceedingly derelict in fulfilling their parental responsibilities to these children, and in following through on the perfectly reasonable course established by the court, DCF, and CFS to follow towards a timely reunification of the family. Nevertheless, it appears to the court that while the two boys were in placement, prior to the filing of the termination petitions (and prior to the suspension of visitation), the parents showed interest and concern regarding their sons, and always made it clear that they felt the boys should be returned home and that they, as the natural parents, should be allowed, at some point, to resume the caretaking role.[34]
While the court encounters enormous difficulties in undertaking to understand the actions of these parents, even considering their obvious educational and economic limitations, I am unable to conclude, applying a clear and convincing evidence standard, that petitioner has established the ground of statutory abandonment (as of the adjudicatory date). Accordingly, that ground may be, and hereby is, Dismissed.
(2) Failure To Rehabilitate
General Statutes Section 17a-112(b)(2) provides as follows: "The superior court . . . may grant [a termination] petition if it finds, upon clear and convincing evidence, that termination is in the best interests of the child and that . . . over an extended period of time, which . . . shall not be less than one year . . . the parents of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, they could assume a responsible position in the life of the child . . . ."
The term "personal rehabilitation" refers to the restoration of a parent to his or her former constructive and useful role as a parent. In re Rayna M., 13 Conn. App. 23, 32
(1987); In re Migdalia M., 6 Conn. App. 194, 203 (1986). CT Page 8177 Under the statute, the court must "analyze the respondent's rehabilitative status as it relates to the needs of the particular child, and further, [determine] that such rehabilitation must be foreseeable `within a reasonable time.'" In re Luis C., 210 Conn. 156, 167 (1989); In re Joshua Z., 26 Conn. App. 58, 64 (1991). Under Section 17a-112(b) (2), the court is to consider the age and needs of the child with respect to whether the parent could, within a reasonable time, assume a responsible position in the life of the child. cf. In re Midgalia [Migdalia] M., supra at p. 199. A responsible position in the life of the child is not necessarily equivalent to a full-time caretaker; In re Migdalia M., supra at p. 206; and, it is not statutorily required that the parent become capable of assuming full responsibility for the child without the provision of available support programs. Id., at p. 203. Our Appellate Court has stated that a trial court must consider the six factors enumerated in Section 17a-112(d) in determining whether a parent has failed to rehabilitate. In re Michael M., supra at p. 124-25; In re Sarah M., 19 Conn. App. 371, 377
(1989); In re Shavoughn K., 13 Conn. App. 91, 98 (1987).
With regard to compliance with the court set expectations, these parents did visit with the children up to the time that DCF suspended visitation, although the frequency of the visitation may have been somewhat less than that of caring parents working zealously towards a prompt reunification; however, in terms of a clear and convincing evidencing evidence standard, it is again noted that neither the foster parents nor any employee of the SRH was called to refute the parents' testimony of consistent, weekly visitation prior to November, 1991. Overall, the parents did visit the children prior to the agency's action suspending visitation, and there was generally, although not consistent, compliance with that expectation. As to counseling (individual, group, and couples'), no direct evidence of non-attendance was presented from staff of Clark Clinic; however, on the entirety of the evidence, it seems that the parents did not follow through on DCF's referral to the extent of successfully completing any counseling or any therapeutic programs. Cooperation with the agency was, at many times, minimal; and, as petitioner points out, at most, if not all, times during the periods of commitment, the parents were not in a position to provide a safe, stable home for these boys. While substance abuse therapy was not an articulated expectation at CT Page 8178 the commitment proceedings, the social worker(s), as the parents' drug problems evolved and became obvious, quite properly insisted that the problems be addressed through appropriate treatment as a pre-condition of any future return of the children. While the parents did receive some professional help in dealing with their substance abuse difficulties, they did not follow through with sustained treatment to effectively confront their drug addiction. The evidence revealed that respondents' level of compliance with the established expectations, which were formulated as the reasonable procedure for effectuating a timely, safe reunification, was not at all impressive. More significantly, as far as "restoration" of these parents to a "constructive and useful role" as the caretakers for these children, it appears that they are no better equipped now to provide an adequate and safe home for the children than they were at the time of the initial commitments.
Where there has been a failure to comply with certain of the established expectations, and/or where the parents, despite agency efforts, have not been "restored" over time to a status of responsible parenting, such circumstances, in and of themselves, do not preclude an assessment that the parents could, or might, within a reasonable time, considering the age and needs of the individual child, assume a responsible position in the child's life.[35] cf. In re Migdalia M, supra at p. 206. Personal rehabilitation does not require an achieved status as a perfect, ideal parent, or that of a parent capable of serving as a child's full-time caretaker, or that of a parent capable of providing adequate care without support services in place. And, it is conceptually basic in this area of the law that there must be strict compliance with the statutory criteria before parental rights may be terminated.[36]
In assessing whether petitioner has established the instant statutory ground by clear and convincing evidence, the court is confronted with, and essentially accepts, the conclusions of Dr. Ramos-Grenier. She testified that both Jose P. and Juan P. need stability and consistency; that they are both hyperactive, demanding children who require firm, yet patient parenting; and that without certainty, stability, and control in their lives, future acting out behavior is likely to occur. Thus, for the biological parents to assume the caretaking role, it is imperative that they learn (and CT Page 8179 make the sustained, concerted effort to learn) to use, fully, all available support services. The psychologist stated that the parents have the intellectual capacity to parent adequately, but are extraordinarily immature and neither understand, nor fully acknowledge, their parenting deficits and past delicts; as stated heretofore, Dr. Ramos-Grenier viewed the parents' desire to regain custody of the children as "geared towards their own needs, rather than towards the needs and interests of the children."
The psychologist testified, credibly, that the children showed a strong attachment to their biological parents, that they had consistently (and quite spontaneously) stated their wishes to live with the parents, and that it would be very difficult psychologically for the children if parental rights were terminated. In the psychologist's view, denial of parental visitation for the protracted period, served to impede any progress on the part of the parents. She stated that although the boys show some bond to their foster parents, both Jose P. and Juan P. see the biological parents as their "real parents."
Dr. Ramos-Grenier has dealt with this family for years, and has conducted numerous evaluations of the parties relative to this continuing litigation. She acknowledges that the likelihood of the parents "coming around, despite their intellectual capacity to do so, as well as their ability (or willingness) to accept, and follow through on, services, is not at all encouraging. Nevertheless, the evaluator still felt that the parents, faced squarely with the prospect of losing the children, and with specifically mandated conditions to fulfill, might partake in the rehabilative process to the point where they could, perhaps, with support services in place, assume a responsible caretaking role. Dr. Ramos-Grenier referred to a reasonable time frame as six months and proposed a detailed plan for reunification with time constraints and, as stated, with specific conditions to be clearly communicated to the parents.
The parents did visit up to the point where DCF denied further visitation rights; the boys know, and have shown a strong attachment to, their parents and, according to the psychologist, termination would be traumatic for both Jose P. and Juan P. The respective ages of the two children are critical, particularly with regard to the older child, Jose CT Page 8180 P.; however, the evidence did not show any specific, prospective adoptive placement established by DCF for Jose P. at the present time. And, with respect to Juan P., the child remains with his foster parent who would be the intended or anticipated adoptive parent upon any future TPR. Considering the psychologist's prognosis respecting these parents, which is admittedly quite guarded, as well as the facts and circumstances (ages, needs, etc.) of the children, and the proposal of that professional who has worked with this family for years, the court, agonizingly, is unable to conclude that petitioner has established all elements of this ground (encourage belief that with a reasonable time, considering ages and needs of children, could assume a responsible position) by clear and convincing evidence,[37] Accordingly, the failure to rehabilitate ground may be and hereby is Dismissed.
(3) No Ongoing Parent-Child Relationship
General Statutes Section 17a-112(b)(4) provides, as follows: "The superior court . . . may grant . . . [a termination] petition if it finds, upon clear and convincing evidence, that the termination is in the best interest of the child and that . . . over an extended period of time, which . . . shall not be less than one year . . . there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child."
The absence of a parent-child relationship involves a situation where the child has never known his parent so that no relationship ever developed between them, or where the child has clearly lost that relationship so that despite its former existence, it now has been completely displaced; our courts have stated: "`[i]n either case the ultimate question is whether the child has no present memories or feelings for the natural parent.'" In re Juvenile Appeal (Anonymous),181 Conn. 638, 645-646 (1980); In re Juvenile Appeal (94-3),1 Conn. App. 463, 479 (1984); In re Shannon S., 41 Conn. Sup. 145,158 (1989). Our Supreme Court has held that the statutory definition of no ongoing parent-child relationship is inherently ambiguous when applied to noncustodial parents CT Page 8181 who must maintain their relationship with their children through visitation. In re Valerie D., supra at p. 531; In re Jessica M., 217 Conn. 459, 467-68 (1991). The feelings or memories of the child with regard to the natural parent(s) means feelings or memories of a positive nature. In re James T., 9 Conn. App. 608, 616 (1987); In re juvenile Appeal 6), 2 Conn. App. 705, 709 (1984); In re Shannon S.,41 Conn. Sup. 145, 159 (1989). However, merely a troubled relationship between the parent and child is not a basis for termination of parental rights on this statutory ground. In re Juvenile Appeal (Anonymous), 177 Conn. 648, 671 (1979); In re Juvenile Appeal (84-6), supra at p. 708-09. Under established law, a "best interest of the child analysis is irrelevant in determining whether an `ongoing parent-child relationship' exists;" the termination ground must be established as of the adjudication (filing) date, in this case 3/20/92. In re Romance M., supra at p. 859.
The evidence was clear that both Jose P. and Juan P. know, remember, and have a significant attachment to their biological parents. There is no indication that either child harbors negative or hostile feelings toward their natural parents. Petitioner has not established the existence of the alleged no ongoing parent-child relationship ground, as of the adjudicatory date, and said ground may, therefore, be, and hereby is, Dismissed.[38]
 Disposition: Neglect/Uncared For Petition (Jonathan P.)
The court has adjudicated Jonathan P. a neglected/uncared for child. In the court's view, the totality of the evidence clearly establishes, applying a fair preponderance of the evidence standard, that the respondents are not in a position to care for this child, or to provide an appropriate, safe, and nurturing home. Neither parent has fully cooperated with DCF, and neither has shown any sustained, consistent progress in addressing their serious, continuing parenting and substance abuse problems. On the entire evidence, applying a fair preponderance standard, it is hereby found: (1) to the extent possible, given the parents' minimal cooperation with the agency, reasonable efforts were made to prevent the continued removal of this child from the home; and, (2) commitment to DCF is in the best interests of the child. Jonathan P. is hereby committed to the Department of CT Page 8182 Children and Families for a period not to exceed eighteen months until March 28, 1995 The effective date of the commitment is September 28, 1993 No less than ninety days preceding the expiration date of this commitment, the Commissioner shall proceed pursuant to General Statutes Section 46b-129(e). The Commissioner shall file a treatment plan with the court on or before 12-28-93.[39]
Petitioner not having established, by the required standard, a ground for termination of respondents' parental rights to Jose P. and Juan P., the termination petitions are Denied, and Dismissed.[40]
Mulcahy, J.